IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>vs.<br><br>PHILLIP BINDER,<br><br>              Defendants. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON MOTION TO SUPPRESS**<br><br>Case No.  2:05CR597DAK |

This matter is before the court on Defendant Phillip Binder's Motion to Suppress Evidence.  The court held an evidentiary hearing on the motion to suppress on December 13, 2007, and closing arguments on March 4, 2008.  At the hearings, Defendant appeared and was represented by Santo J. Volpe, and Plaintiff was represented by Veda M. Travis.  The court carefully considered the memoranda and other materials submitted by the parties.  Since taking the matters under advisement, the court has further considered the law and facts relating to these motions.  Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

**FINDINGS OF FACT**

On July 22, 2005, at approximately 11:30 a.m., Utah Highway Patrol Trooper Nick Bowles was on duty in his patrol car, which was sitting stationary in the I-70 median near milepost 182.  Bowles was facing eastbound watching westbound traffic.  As Bowles was

looking westbound, a white pickup truck came up behind him and passed by going eastbound. The pickup truck had two wheels on each side of the rear axle and was pulling a trailer with a very old car on it. Bowles took particular note of the truck and trailer because he had stopped a similar truck and trailer with an old car several weeks before.

During Bowles' previous stop of the truck and trailer, he had become suspicious of illegal activity. Because of the familiarity to that earlier stop, Bowles pulled out of the median and began to follow the truck and trailer. As Bowles approached the truck, he noticed the trailer travel over the right fog line several inches. The trailer continued to travel over the fog line for approximately a mile or a mile and one-half, which is a violation of Utah law. Because there appeared to be no external factor contributing to the lane violation, Bowles believed there was a safety concern. Based on his patrol experience, Bowles knew that the leading causes of accidents in that area of I-70 are drivers falling asleep or not paying attention. Bowles testified that he routinely pulls over drivers who have driven over the fog line to make sure that those drivers are not falling asleep or otherwise impaired.

As a result of the lane violation, Bowles initiated a traffic stop of the white pickup truck and trailer. When Defendant began to slow down and pull over, Bowles noticed that the passenger-side brake light on the trailer was not working. The inoperable brake light was also a violation of Utah law.

Bowles approached the stopped truck and trailer on the passenger side for safety reasons. He notice two occupants in the truck, a male driver and female passenger. Bowles immediately

recognized the driver as Phillip Binder whom he had stopped on June 5, 2005. Bowles did not know that Binder was driving the truck until he approached the vehicle after it was stopped.

Bowles asked Binder for his driver's license and vehicle registration. Binder gave Bowles an Illinois license, an Illinois registration for the truck, and an insurance card. As Binder handed the documents to Bowles his hands were trembling. Bowles also noticed that Binder's voice was very shaky. The vehicle registration showed that the truck had been registered to Phillip Binder on July 14, 2005. Binder told Bowles that he had owned the truck for approximately two weeks.

Bowles explained to Binder why he had pulled him over and asked Binder about the car he was towing on the trailer. Binder told Bowles that he was picking up the car for his uncle again. "Again" referred back to Binder and Bowles' previous encounter on June 5, 2005. Binder's statement on July 22, 2005, indicated that he apparently recognized Bowles from the previous encounter. Bowles and Binder referred back to the June 5, 2005 stop during their conversation on July 22, 2005. Bowles stated that he considered the facts and circumstances surrounding the previous June 5, 2005 stop in assessing the July 22, 2005 stop.

On June 5, 2005, Bowles was contacted by a deputy sheriff with the Grand County Sheriff's Office. The deputy told Bowles that Nation's Towing in Moab had contacted him regarding suspicious circumstances. Nation's Towing reported that they had towed a U-Haul into Moab that had broken down on I-70. The U-Haul was towing a very old car in poor condition. The U-Haul itself, however, was empty. According to Nation's Towing, the responsible party for the U-Haul had been very nervous and in a big hurry to get back on the road.

After being contacted by the deputy on June 5, 2005, Bowles drove toward Nation's Towing in Moab. While driving there, Bowles noticed a vehicle matching the description given by the deputy. He say a U-Haul towing an old car at a gas station at the south end of Moab. Bowles turned around and went north of the gas station. He then saw the U-Haul pull out of the gas station and head north on State Road 191. To Bowles' recollection, the U-Haul failed to signal or failed to stop before pulling out. Bowles stopped the U-Haul for the traffic violation. Bowles recalled that Binder was listed as the renter of the U-Haul.

During the June 5, 2005 stop, Binder was extremely nervous, and the passenger with him was also nervous. The passenger stared straight ahead unless Bowles asked her a question. When asked a question, the passenger looked at Bowles, answered the question, and then looked straight ahead again. Binder told Bowles that he was helping his uncle move from California to Illinois. Bowles considered the statement to be inconsistent with the report from Nation's towing that the U-Haul was empty. When Bowles asked for the uncle's name, Binder stated that his name was Mike. When Bowles asked for a last name, Binder very hesitantly drew out the name, saying that his uncle's name was Buhler. Binder also told Bowles that he worked for Blue Cross and had taken time off work to help his uncle move.

On June 5, 2005, Binder was pulling an old, run-down car with the U-Haul. Bowles asked Binder why he was transporting the old car. Binder said that his Uncle Mike restored cars and sold them for a large profit. The old car, the make and model of which could have been considered a classic, was rusted through in places and did not appear to Bowles to be restorable due the extremely poor condition. Moreover, the car did not appear to Bowles to be the kind of

car transporting across the country. Binder had no paperwork for the car and Bowles informed him that without paperwork, Binder had no way of showing ownership or proper possession of the old car. Bowles told Binder that he should carry the title, bill of sale, or other document showing that he was authorized to have the car.

During the June 5, 2005 stop, Binder showed Bowles his Illinois driver license. Binder told Bowles that he lived in Illinois and had flown to California to help his uncle move back. Binder stated that he and his female passenger had flown in, rented a hotel room, but did not stay in the hotel room. Rather, Binder picked up the old car, which had been left in the parking lot of the hotel, and left immediately without meeting anyone about the car. The female passenger, however, told Bowles that she and Binder picked up the old car from Binder's uncle, whose name she did not know.

Binder also stated that he had received some money before leaving Illinois. He told Bowles that he received the money from "Mike's sister", then he paused and said, "my mother."

On June 5, 2005, Binder also told Bowles that Mike's son was traveling with him in another U-Haul that was full of items being moved. When Bowles asked the female passenger about the other U-Haul, she said that they had not been traveling with anyone. Bowles confronted Binder with this inconsistency, and Binder admitted that they were not traveling with anyone else.

Based on what Bowles believed to be indicators of narcotics trafficking, Bowles asked Binder for consent to search the U-Haul and the old car. The indicators included the information from Nation's Towing, Binder's demeanor, his passenger's demeanor, the implausible story, and

the inconsistent statements between Binder and his passenger.  When Bowles asked for consent, Binder did not give consent but told Bowles that he wouldn't find anything.  Bowles then told Binder that he was going to contact a canine officer to have an exterior sniff done by the dog.  In response to that statement, Binder appeared to be scared.

Bowles then called for a drug-trained dog.  Trooper Sanford Randall and his dog Deets responded to the scene.  When the dog was deployed on the U-Haul and the old car, the dog did not alert.  The dog's failure to alert, however, did not alleviate Bowles' suspicions that Binder was trafficking in narcotics.  Bowles knew that dogs sometimes missed narcotics.  But Bowles felt that he had no options and told Binder that he was free to leave.  Binder sighed deeply and said, "I just want to go home."

During the stop on July 22, 2005, Bowles returned to his patrol car after obtaining Binder's driver's license and other documents.  Due to the similarities with the June 5, 2005 stop, Bowles then contacted Trooper Brian Redd and asked Redd to respond as backup.  When Redd arrived, Bowles spoke to him briefly and then re-approached the truck and asked Binder for the trailer registration and paperwork for the old car.  Binder gave Bowles a registration for the trailer but he did not have any paperwork for the old car.  The trailer had been registered to Binder on July 14, 2005, the same date as the pickup truck.  Bowles tried to run a registration for the old car, but no results were found.  Bowles considered this to be an indicator of drug trafficking.  In Bowles' training and experience, recently purchased vehicles can also be indicators of drug trafficking.  Drug traffickers purchase vehicles and register the vehicle in the driver's name to counteract the common indicator of the third-party vehicle.

Bowles asked Binder to step out of the truck. Binder complied and the two met between the trailer and the patrol car. Bowles asked Binder about his travels, and Binder said that he was coming from California where he had picked up the old car for his uncle. Bowles found it implausible that it was cost-effective to transport the old car.

Bowles also asked Binder about his uncle and what his name was. Binder said that his name was Mike. When Bowles asked Binder for his uncle's last name, Binder hesitated and then quietly said what Bowles thought was Brown. Bowles could not hear Binder very well so he asked for the last name again. Binder said it was Broker. On June 5, 2005, Binder said his uncle's last name was Buhler.

On July 22, 2005, Bowles again asked Binder what his uncle did with old cars. Binder told Bowles that his uncle buys old cars and then turns them around for a small profit. This statement differed from what Binder had said on June 5, 2005, and made the transport of the old car for that purpose even more implausible.

Bowles then asked Binder about his passenger. Binder stated that she was a friend and her name was Angela. But Binder did not know her last name. Bowles asked Binder about the other woman he had been with on June 5, 2005, and Binder states that she was his girlfriend and she was back in Illinois.

Bowles asked Binder how he was getting so much time off work. Binder told Bowles that he was on medical disability and that he had received more leave than he needed. Binder had not mentioned his medical disability on June 5, 2005.

During the July 22, 2005 stop, Binder was again very nervous. Bowles found the nervousness to be more extreme than that of the average drive. Bowles also found that, unlike most motorists, Binder's nervousness did not subside as the traffic stop progressed.

Bowles also spoke to the passenger, Angela Gaines. Gaines claimed that she and Binder had left Illinois on Monday and had stayed in California for four days. Her statement was implausible in light of the fact that she and Bowles were speaking on Friday. Gaines also told Bowles that Binder had asked her to go with him on the trip to California to pick up a car. When Bowles asked Gaines where they had picked up the car, she told him she didn't know anything about it. Gaines seemed very unsure about her answers. She paused and hesitated before responding to questions.

After Bowles spoke to Gaines, he went back to talk with Binder again. As he was walking to the truck, he noticed that Trooper Reed was signaling for him to come back to the patrol car. Bowles went back to the patrol car and spoke with Redd. Redd told Bowles that he had observed this same truck pulling the same trailer and old car heading westbound on I-70. Bowles asked Redd if he was certain he had seen the same truck, trailer, and car. Redd said that he was certain and pointed out identifying marks on the car which he had recognized from several days before. Redd recognized that on the old car being towed that there was a little fire sticker in the center toward the bottom of the rear windshield and an Illinois temporary tag with large lettering in an off-red color. Redd also recognized the trailer plate on the bottom left of the trailer because the numbers had stood out to him.

Based on the information from Redd, Bowles again approached Binder and asked him if he had towed the old car out from Illinois to California. Binder said that he had not. Bowles again spoke with Redd. Redd again told Bowles that he was certain that he'd seen the same old car being towed by the same trailer several days before on westbound I-70.

Based on all the facts and circumstances, Bowles and Redd agreed that they had probable cause to search the old car for illegal narcotics. In Bowles' training and experience, he is familiar with a number of instances in which illegal narcotics were located in cars being towed. Bowles himself had found drugs in towed cars and has assisted other officers who have found drugs in towed cars.

Bowles asked Binder for consent to search. As on June 5, 2005, Binder told Bowles that he would not find anything. After going back and forth for a minute or two, Binder then told Bowles that the old car was not his vehicle and he, therefore, could not give the troopers consent to search it. Bowles informed Binder that he and Redd felt that they had probable cause to search and were going to do so. In Bowles' opinion, Binder looked as though he was going to pass out when he heard the officer's intent to search.

For safety reasons, Bowles instructed Binder and Gaines where to stand as he and Redd began searching the old car. As Bowles began the search he crawled underneath the car to examine the undercarriage. He noticed there was no floor in the trunk because the floor had been rusted out. Bowles also noticed that the interior was in very poor condition and the entire vehicle looked as if it were ready to fall apart. The engine compartment, however, appeared to have been painted black and the engine block had been polished chrome. The top of the engine block was

very clean.  Trooper Bowles also noticed that some of the bolts were missing on top of the engine block and that some of the bolts were only screwed down halfway.  Based on those observations, Bowles and Redd believed that the engine area needed to be searched thoroughly.  Due to the heat, the troopers decided to move the old car to a more controlled area.

Bowels explained to Binder that he would be moving the truck, trailer, and old car to the Thompson fire shed, located approximately two miles away.  Bowles had Binder follow Redd to the Thompson fire shed.  Binder drove his truck, with the trailer in tow.  Angela Gaines rode with Bowles in his patrol car.  During the ride, Bowles asked Gaines if she and Binder had towed the car from Illinois to California, and she said they had not.  Bowles then informed Gaines that Redd had seen the old car on the trailer heading westbound several days earlier.  At that point, Gaines admitted that they had towed the old car from Illinois.

When they arrived at Thompson fire shed, Bowles and Redd completed the search of the old car.  They found 20 kilogram-sized packages in the engine block.  Some of the packages were wrapped in electrical tape and others were wrapped in green cellophane.  One of the packages field tested positive for cocaine.

Binder and Gaines were arrested and transported to the Grand County Jail.  Redd attempted to interview Binder and Gaines and advised Binder of his *Miranda* rights.  Redd told Binder that he would likely be facing federal charges and could be looking at a 20-year minimum mandatory sentence.  Redd also told Binder that he could help himself by cooperating, but he made no promises to Binder.  Binder told Redd that he wanted an attorney at which point Redd

advised Binder that if he was interested in cooperating with authorities or speaking with Redd again, Binder would have to initiate the contact. Redd then ended the interview.

A few days later, on the evening of July 25, 2005, Redd was contacted by a deputy at the Grand County Jail. The deputy told Redd that Binder wanted to talk to him. Redd went to the jail and, in the presence of Deputy Tim Jordan, spoke with Binder. Binder asked Redd what was happening to him. Redd then reminded Binder that he had previously invoked his right to counsel and that Redd would have to re-advise Binder of his *Miranda* rights before they could talk.

Using a Grand County Sheriff's Office waiver of rights form, Redd re-advised Binder of his rights. Redd then asked Binder to sign the form. Binder would not agree to sign the form, but told Redd that he understood his rights and wanted to talk. Redd then completed reading the waiver of rights form and Binder again said that he wanted to talk. Binder then told Redd that he was not totally innocent, admitting that he was involved in transporting narcotics. Binder further admitted to making four trips between Chicago and Los Angeles since May 2005, and said that he was being paid $2500 per trip.

At the time Redd interviewed Binder, Binder had not yet appeared in state court. Binder did not make his first appearance until August 2, 2005. After Binder and Gaines were arrested, Bowles searched the old car for a VIN but could not locate one.

## CONCLUSIONS OF LAW

Defendant Binder argues that the search in this case did not fall within one of the well-defined exceptions to the warrant requirement of the Fourth Amendment. The government,

however, maintains that Binder was lawfully stopped and detained, Binder has no standing to object to the search, and Trooper Bowles had probable cause to search the vehicles. Binder further contends that his statements to Trooper Redd should be suppressed because they were obtained in violation of Binder's *Miranda* rights.

### A. Stop & Detention

The legality of a traffic stop is to be examined under the two-prong test announced in *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). *United States v. Williams*, 403 F.3d 1203, 1206 (10th Cir. 2005). First, the stop must be "justified at its inception." *Id.* Second, the officer's conduct during detention must be "reasonably related in scope to the circumstances which justified the initial stop." *Id.* The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

The stop in this case was justified at its inception because Bowles witnessed Defendant violate a traffic law. *See United States v. Botero-Ospina*, 71 F.3d 783 (10th Cir. 1995). "[T]he decision to stop a vehicle is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren v. United States*, 517 U.S. 806, 810 (1996). In this case it is uncontroverted that Bowles saw the trailer travel over the fog line for at least one mile, which is a violation of Utah law. Although Defendant attempts to discredit Bowles' decision based on another case involving a similar stop, the court sees no basis for finding the stop invalid. The stop, therefore, was justified at its inception.

Because the stop was justified at its inception, the court must analyze whether the scope of the detention was reasonably related to the circumstances that justified the interference in the

first place.  In *United States v. Mendez*, 118 F.3d 1426 (10th Cir. 1997), the Tenth Circuit stated that an officer conducting a routine traffic stop may investigate whether the driver has a valid license, valid registration, valid insurance, has warrants, or is in lawful possession of the vehicle. *Id.* at 1429.  The officer may detain the driver and the vehicle as long as reasonably necessary to make those determinations or to issue a citation or warning. *Id.*

In this case, although the truck and trailer were recently registered to Binder, he had no documentation on the car that was being towed.  It was, therefore, reasonable for Bowles to run reports on that vehicle and to detain Binder until he could determined that Binder was in lawful possession of the vehicle.

Moreover, an officer may detain the driver and vehicle if the officer develops reasonable suspicion that the driver is engaged in criminal activity.  "An investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity." *United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997).  Reasonable suspicion is based on the "totality of circumstances." *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995).  "[T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.  Trained officers aware of modes and patterns of operation of certain kinds of lawbreakers can draw inferences and make deductions that might well elude untrained persons." *Mendez*, 118 F.3d at 1431.  "[T]he reasonable suspicion calculus turns on whether the specific articulable facts, when viewed together through the lens of a reasonable law enforcement

officer, justified a brief roadside detention." *United States v. Doyle*, 129 F.3d 1371, 1376 (10th Cir. 1997).

The facts in this case demonstrate that Bowles developed reasonable suspicion of illegal activity during the July 22, 2005. Bowles' earlier encounter with Binder on June 5, 2005, also created reasonable suspicion. Bowles was reasonable in assessing the facts and circumstances of both encounters. The inconsistencies between Binder's responses on the two dates, such as giving different last names for his uncle, rightfully raised Bowles' suspicions. In addition, the inconsistencies between Binder's responses and his passengers' responses on both dates caused suspicion. *See United States v. Kopp*, 45 F.3d 1450, 1453-54 (10th Cir. 1995). Implausible travel plans also support a finding of reasonable suspicion. *United States v. Alcarez-Arellano*, 441 F.3d 1252, 1260 (10th Cir. 2006). The duration of the detention was reasonable given the number of inconsistent and implausible answers Bowles received from Binder in response to routine questions.

The facts and circumstances surrounding the July 22, 2005 stop raised numerous indicators of narcotics trafficking–extreme nervousness that did not subside, recently registered vehicles, inconsistent statements, implausible travel plans, towing a vehicle, and Redd's observation of the same vehicles traveling westbound several days before. The court finds the government's burden of establishing reasonable suspicion is easily met.

    **B.  Search of Car**

With respect to the search of the old car being towed on the trailer, the government argues that Binder has not demonstrated that he has standing to object to the search. A defendant who

moves to suppress evidence has the burden to show, by a preponderance of the evidence, standing to challenge the search. The test to establish standing is whether "the individual manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." *United States v. Allen*, 235 F.3d 482, 489 (10th Cir. 2000).

To establish standing a defendant must show a "legitimate possessory interest in or lawful control over the car." *Id.* "[M]ere possession of the car and its keys does not suffice to establish a legitimate possessory interest." *United States v. Hocker*, 333 F.3d 1206, 1208 (10th Cir. 2003). "[A]t a minimum, the proponent bears the burden of establishing 'that he gained possession from the owner or someone with authority to grant possession.'" *Id.* (citation omitted).

Binder claimed that the old car being towed belonged to his uncle, but he did not have any documents establishing his uncles ownership of the car. Moreover, Binder gave Bowles three different last names for his Uncle Mike. Bowles was also unable to locate a VIN on the vehicle. When Bowles asked Binder to consent to the search of the old car, Binder stated that the car did not belong to him and he had no authority to consent to the search. The court concludes that Binder had no expectation of privacy in the vehicle and, even if he did, society is not prepared to recognize that expectation as reasonable. Accordingly, Binder does not have standing to object to the search of the old car.

Even if Binder had standing to challenge the search, the court concludes that Bowles had probable cause to believe the vehicle contained contraband. *Carroll v. United States*, 267 U.S. 132 (1925); *United States v. Nielsen*, 9 F.3d 1487, 1489-90 (10th Cir. 1993). Probable

cause "requires only a probability or substantial chance of criminal activity, [and] not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243-44 n.12 (1983).  As in the courts determination of reasonable suspicion, the court believes that the indicators present on June 5, 2005 and July 22, 2005, established a fair probability that illegal narcotics were being transported in the old car being towed.  Therefore, the court concludes that Bowles' warrantless search of the old car was lawful.

### C.  Statement

Binder further argues that his statement to Redd should be suppressed.  Binders first argues that the statement should be suppressed because it was induced by the taint of an unlawful arrest.  The court, however, has concluded that Binder's arrest was lawful.  Binder's other arguments are based on alleged misconduct in extracting comments from Binder by means of keeping him in jail for three days, not obtaining an attorney for him and scaring him as to possible charges.

It is undisputed that Redd stopped talking to Binder after he recited the *Miranda* warnings and Binder invoked his right to counsel.  Redd told Binder that if he wanted to talk to him at a later time, he would need to initiate the communication.  Three days later, Binder initiated the communication.  At that time, Redd again recited the *Miranda* warnings to Binder and Binder waived his rights by stating that he wanted to talk.

The officers were under no obligation to obtain an attorney for Binder before his initial appearance in court.  There is no allegation that Binder was denied the ability to make telephone calls.  Therefore, he was capable of retaining his own counsel prior to his initial appearance and

there is no basis for finding a violation of his right to counsel. Moreover, statements that a defendant could be charged in federal court, that he may be facing minimum mandatory sentences, or that may help himself by being cooperative are not the kind of coercive conduct that rises to the level necessary to violate *Miranda*. Because the evidence demonstrates that Binder understood his rights and chose to waive his rights and re-initiate the communications with Redd, the court finds no violation of *Miranda*.

## CONCLUSION

Based on the foregoing, Defendant's Motion to Suppress Evidence is DENIED.

DATED this 21st day of March, 2008.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge